Coaiteb, Judge.*
Seeing no reason to change the opinion I formerly gave in this case, I shall only add to it some fewr remarks on the broad ground taken in the second argument, and on the cases referred to for its support.
The objection made to the jurisdiction of the court in this case I am of opinion cannot be sustained. The assets in the hands of the appellant might be affected by his failure to take the course he has done,- for if the court shall be of opinion that usury has been practised, the assets must be increased by half the amount at least of the usurious interest. Being then interested in this amount, and finding that the surviving partner, fearful of jeoparding his own credit, and that of his indorser’s, declines to take a measure calculated to benefit the estate, the appellant represents,- and as it might be unjust and unreasonable, at a future day, to throw this loss on the surviving partner, because he failed to do an act tending perhaps to an immediate and greater injury, *59 even to the partnership itself; or an act which from his knowledge of the transaction, he might have thought he could not in honor or in conscience do; the appellant was right not to risk this remote and more doubtful „ , . . ... ... . . , chance oí doing justice to his intestate’s estate, and was therefore justified in pursuing the most effectual, and probably the only certain mode of securing it. The great question then is whether usury was practised or not.
The. bill charges that on the 14th April 1811, Holloway & Hanserd, being greatly pressed for money, applied to the appellee Bruce for the loan of 03603 78, informing him of their distress; which they obtained at the unconscionable interest of 1 per cent, per month, and that in October of the same year, being as was known to the said Bruce. in increased distress, they applied few a loan of a further sum, which they obtained at a heavier rate, to wit, from 20 to 25 per cent, per annum.
The defendant, in his answer, denies that he ever had any money transactions with Holloway and Hanserd, or either of them, and that no communication for a loan ever passed between them or either of them and him. He admits he purchased five notes made by Holloway and Hanserd, three of them bearing dale the 14th April 1811, payable in six, nine, and twelve months, without interest, and indorsed in blank by John Allison; and the other two bearing date the 7th October, in the same year, without interest, in nine and ten months, indorsed in like manner, by Thomas Atkinson. They were all negotiable at the branch bank of Petersburg.
For the first three of MOO dollars each, he gave 03628 80, and for the two last of 01250 cadi, he paid 02143 75.
The defendant further admits that lie has occasionally purchased negotiable paper in market; believing that he violated no rule of law or morality thereby, and avers, that so far as he was concerned or acquainted .with this *60 transaction, it was a fair purchase of the notes and not a loan: and that with regard to the circumstances of Holloway and Hanserd, he had no particular information. He expected the notes would be duly honored or he would not have bought them. He says he purchased them of John L. Mertens, but whether he was the agent of Holloway and H. or not, and on what terms, he presumes are questions with which he has nothing to do.
The answer in this last particular was excepted to, “ because under the charge of usury made in the bill, “ the plaintiff considers it'highly important to ascertain, “ by the defendant’s answer, whether Mertens was the “ agent of H. & H., and whether the defendant made “ the bargain with him for the said notes in that char- “ acter.”
The defendant amends his answer and says he doth not recollect or believe, that Mertens informed him that he was the broker or agent of H. & H. or either of them, or acting for them in the business; neither did he receive such information from any other quarter.
Thus stands the case upon the bill and answer. Every material allegation of the former, being denied in the latter, and consequently that must stand as true unless contradicted by the requisite countervailing proofs. It is true the defendant admits in his answer, that he received the notes at a discount which would be usury, if the transaction had taken place in consequence of a personal interview between him and the makers, as is alleged in the bill, whether a loan of money had been mentioned or not; there being no difference between the execution of a note before the money is advanced, and the pretended sale of that note by the maker at an usurious discount; and the execution of such note afterwards, in order to secure the money advanced with usurious interest. The' former would be clearly a shift to evade the statute: it would be no answer for the parly to say, that *61 '¿here being nothing said about a loan he considered it a fair purchase of a note in market. He must know in the case supposed, that the note was given for no other consideration but that of the money so advanced: so too if the transaction had been between the known agent of the makers of the notes, acting for them in the negotiation, the same result must follow; but in this latter case, the knowledge in the purchaser of the agency must be acknowledged or proved, in order to put the case on the same ground of decision with one of an immediate communication between the parties: and it was to extract an acknowledgement of this important fact, if it existed, that the exception to the answer was taken. I think it would Siave been more proper unless an immediate communication between the parties was still intended to be insisted upon, to have amended the bill charging this knowledge, and also charging the knowledge of facts, which might have led the defendant to suspect it, if the plaintiff supposed proof of a knowledge of suspicious circumstances was enough.
That there was a known agency in this case is denied; and therefore had the case stood on bill and answer it must have been decided not to be an usurious transaction; unless the purchase of a negotiable billy indorsed in blank, as this was, (the purchaser being ignorant that it was sold by the maker) at a discount greater than legal interest, be usury.
If a note of tins kind is made and sent into market, say for the express purpose of being sold, and it is sold to A. at a discount not exceeding lawful interest, it is a good note in the hands of A. whether he purchase from a stranger, from the makers, or from their known agent. This is the situation of the most numerous class of notes negotiated at our banks, being made not on real transactions between maker and indorser, but for the accommodation of one or both of them. But suppose that A. after-wards, being under the necessity of raising money, sends *62 this note into market again, still remaining indorsed in blank, and it is sold at a discount beyond lawful interest, this sale is not usury in the purchaser either as to ^ie ma'iCr or holder. Or suppose A. sells his tobacco to his merchant JB. on a credit, and receives in .payment j.j10 nopj of B. given to C. and indorsed by him in blank, in payment. Say even that B. lias such note in his possession, amounting only to the price agreed on for the tobacco, but made for the purpose of being sent into market, and finding lie can purchase this crop of tobacco and would rather send that into market, delivers the. note to A., such note executed after sale of the tobacco would surely be good in the hands of A. and so would that executed before, especially if the price of the tobacco had been fairly agreed on without reference to that note in particular, so as to shew that there was no usurious shift in relation to it. And if A. in either case sends such note into market, (indorsed in blank by (3.) a purchaser of it, even from A. himself, at a discount greater than legal interest could not be deemed guilty of usury, even as to A. according to what I understand to he the uniform course of decision in this court, much less as to the maker and indorser.
Notes of this kind then, in the form which those in question bear, may be sold in market at a discount beyond legal interest, without subjecting the purchaser either to the odium or to the pains and penalties of usury. Had these notes been passed off by H. & CL dollar for dollar in payment of a debt contracted before or after their execution; or discounted at 6 per cent, as before stated, they would have been good am! binding on the makers. They were then not usurious and void when made, for if so nothing afterwards can make them good. But like every thing else they were capable of being the subject of an usurious contract made concerning them. Whether they have been the subject of such *63 contract is the question before us, and that must be provcd as in all other contracts and cases of that nature.
Sales of property of tisis kind, to wit, notes, bonds, stock, or other money securities are generally effected, in large towns, by brokers. Persons who are not the owners and known not to be the owners of the property sold, but who act for the owner, and whose name from a prudential motive, is frequently withheld, and the transaction is perfectly fair and legal; and I can neither find any case nor principle which would justify me in placing a sale made by such public agent, if he. may be so called, on a ground different from one made by a private agent. All the sales above supposed might have been lawfully made by the public known broker, and under a direction too, to conceal the name of his principal.
There must be something then, beyond a ban purchase of a note of this kind, at a discount above legal interest, to stamp the transaction with the stain of usury, and in the case before us, according to the answer, the exception thereto, and the amended answer, (for the bill makes no specific charge on the subject,) the, inquiry raised is, whether these notes were or were not procured from the makers through the agency of a known agent, acting for them in the negotiation? Hie answer denies a knowledge of this agency $ and to my mind there is no proof of such knowledge, which could have weighed a moment in a trial at law, much less to overthrow the defendant’s answer which until disproved must stand as testimony in the cause on the other side. If the answer was not sufficiently responsive it ought to have been excepted to.—In fact the bill makes no charge on this subject requiring a response, the exception puts the question on the ground of a known agencyj the answer denies information of this agency, by the agent himself, and also that it was received from any other quarter, and nothing is charged or alleged from which such knowledge might be *64 inferred; if it was competent for the court to infer any thing so as to support the charge of the crime of usury.
If the plaintiff had other grounds than those resting on ^ie knowledge of the agency whereon he could establish the charge of usury, he ought to have amended his bill, and charged those grounds, so that issue might have been taken thereon, and the party have the benefit of his answer or of his demurrer if he was not bound to answer. At present the case must rest on that point only; unless indeed as is above stated, the purchase however fairly made, was per se, usurious, being at a greater discount than legal interest.
It has been urged in argument, that the defendant under the circumstances disclosed in the testimony, had good grounds to suspect that he was in reality purchasing the notes from the makers, and not from a bona fde holder, and that if he was even ignorant, it was wilful ignorance, and he shall be as much criminated thereby as with actual knowledge.
By this, I understand is meant to be affirmed in the first place, that these grounds of suspicion, as they are called, amount to sufficient proof that he knew the fact in question; and secondly that if lie did not know, he ought to have inquired, and not doing so he is guilty of usury.
First, what are these circumstances, and are they sufficient to overthrow the answer; or to establish the fact if the answer had been silent on the subject, and not excepted to?
The notes had on them the names of undoubted men, who probably would not themselves send them into market to be sold at a sacrifice. Agreed. But if they had been given by the merchants to planters for tobacco, and sent by the latter, or by any persons to whom the latter might have passed them into market, they would have remained in the same form in which they now are, if the seller did not wish to make himself responsible, and the pur *65 olí a.ser would have been satisfied, as in this case, with the indorsers. But the more the credit and caution is raised the greater would be the impression that the traps-action was real. Would cautious men indorse for merchants whose circumstances were known to be such as described in the bill? Traders involved in pecuniary difficulties, who had become a prey to usurers.
The very standing of these indorsers was enough to satisfy any one not in the secrets of the legor, that this house was in good credit, and I have seen no proof in this cause, even now, to satisfy me as to their real condition, or whether they have wound up rich or poor. But merchants, since examined, say, that at that time, they were pressed for money, and because they knew it, Bruce, who responding to that part of the bill denies any particular information on that point, also knew it. A. purchases property to which B. has an equitable claim, it is proved that this equity was known to a great many of the neighbours of the seller and B.; and it is also proved that A. residing at a distance, is well acquainted in that neighbourhood: will this charge A. with actual knowledge, especially when he denies it? Again, a house may be pressed for money and yet be able to purchase on credit, and give notes such as these in payment—at least as long as they can procure such indorsers as those on these notes. How then a knowledge in Bruce of every thing that any witness (except Mertens who made no disclosure,) says he knew, can effect this case 1 know not.
All the cases prove, that to constitute usury two wills must concur. It is not enough to prove circumstances known to one of the parties only, and which if known to both would sliow an assent in both to an usurious transaction. No one could with safety purchase property if he could be thus circumstanced, his money taken from him, heavy penalties and great odium incurred, when he, s® far as he knew, was doing an act, not reprobated by the *66 law, biit sanctioned by the uniform decisions of this court.
In Hansborough v. Baylor,(a) the Judges who gave °P*n*ons said> that the nature and substance of the transaction must be got at—the views of the parties must be ascertained—an intention to borrow is not enough; there must also be an intention to lend, and if the purchaser of such paper be ignorant of the intention to borrow he cannot be considered a lender: both must agree to the usurious transaction. So in Gibson v. Fristoe, Judge Pendleton says, if it be a mere sale of property, and bonds are as much property in this respect as any thing else, altlio’ at an under value, it is not usury; but if the bargain proceeds from, or is connected with, a treaty for a loan it is.
Second.—But there were sufficient grounds of suspicion to excite inquiry, and therefore he is guilty. I see no reported case, or principle of decision to justify this doctrine. The general position is, that the will must concur; but for will we substitute ignorance, ignorance I will for the present admit, arising from negligence or fault, but still ignorance.
The party then is punished not for actual known usury, but for his culpable ignorance of facts, which if known, would ’wave made him guilty of usury. It will not do to say that this wilful or culpable ignorance is knowledge of the fact. If the circumstances prove knowledge, then it is not ignorance of any kind. But the proposition is that culpable ignorance is to he considered equal to actual knowledge and punished accordingly.— This is dangerous ground to tread upon when we are about to inculpate a fellow-citizen.
By the wise humanity of our laws, every man is presumed to be innocent until the contrary appears. But who can say here what were the grounds of suspicion known to Bruce? There is a total absence of proof as to him of any knowledge of such facts—others knew facts and *67 we in the first place impute their knowledge to him, and then because that is sufficient to raise suspicion in our minds, we say he must have suspected also; for if he did not suspect tho’ others might, he is not guilty of a fault, he may be unfortunate in being unsuspicious but not criminal, I think we cannot convict of crime on such grounds as these.
But if suspicion in the party is to inculpate him as much as knowledge, ought not the bill to charge that fact, that the party might, answer to it, as he has done as to his knowledge? And is not testimony to this point out of the issue? But what is this fault arising from a failure to inquire? if A. is about to purchase property aud has received such information of a prior equity in B. as would make an inquiry proper, he is bound to make it: why? because the other party is interested in asserting his claim and preventing the purchase. The reverse is the fact in the sale of notes. The seller is interested in concealing a fact which would exclude fair purchasers from the market, and would leave him a prey to usurers; and therefore a true state of the case could not be expected. Why then require such course to be pursued, unless some good will grow out of the establishment of the rule? And what good could result from establishing such a rule, w lien the party would be interested in withholding the truth, and might, by getting a friend as the holder, to take the note into market, or by a thousand other ways, elude the most diligent inquiry?
Nothing of this kind was held necessary in the case of Hansborongh v. Baylor, in which case it appears the bond was made for sale, and not on a real transaction, but the purchaser there, as in this case, was ignorant of that fact.
Suppose we establish the rule that Inquiry shall he made, and it shall turn out on inquiry, that the purchaser is told that the note is for a real transaction, and a fair *68 Sl'hject of purchase but in the trial the reverse is proved, would it be usury, unless it was proved that the purchaser knew this, and that the inquiry was a mere dc-v*ce an(* shift? To my mind such inquiry, unless made necessary, by this court, when the inevitable result woujj pe? that the truth would be concealed, would be a strong circumstance to prove a device. But suppose the party believes the note is sold by the maker, when it is not, but is in fact a legal transaction, will this mistaken belief make it usury?' That was not held to be enough in the case of Price v. Campbell.
I am therefore opposed to any rule which is to operate retrospectively, unless I can see that such rule is so well founded in reason and propriety, that its existence, as a rule of correct conduct, may be supposed to exist previously in the minds of correct men, in regulating their transactions in life. I am the less disposed to do so, because this court in the above case has not hinted at such a necessity: and finally, because unless we are now to exclude money securities from the market, because a bad use may frequently be made of them, f can see no good, no security against the evil, which is likely to result from its adoption.
Any course which the legislature in its wisdom may adopt, to exclude paper of this kind from market, will only operate prospectively, and I therefore prefer' leaving the subject to them.
Taking it at present, that paper of this kind is a fair subject of traffic, but one which may be much abused, for the purpose of eluding the statute against usury, I shall be ready oh all fit occasions to lend my aid in preventing this abuse—farther I cannot go. I must take care, that in weeding the tares, I do not ‘destroy the wheat also.
For these reasons I was, foi’merly, for affirming the decreej but a new argument has taken place, of which I shall take a brief notice.
*69 ' The broad ground now taken is, that where a note is indorsed for the accommodation of the maker, in which case, the indorser having given no consideration for the note, could not maintain a suit against the maker, that such note can in no way be sold at a discount beyond legal interest, without subjecting the purchaser to the penalties of usury, although he may have believed himself a fair purchaser of a note available in market—and it is alleged that some cases in New-York,* and also some reported in Campbell, go this far, and that they have correctly settled the doctrine.
Jones v. Hake, is the first and leading case in New-York. There a note was sent by the maker to a money broker to raise money, after retaining it some time it was returned with a declaration, that if the maker would get another name on it, to wit, that of P. S. he could get him the money at 2 per cent, per month. The name was obtained, and the note returned to Haskins the broker, who advanced part of the money, and after-wards the residue, but the agent of the maker in this transaction did not know whether Haskins was the owner of the money or acted as agent for another, but he knew no other person as the lender.
Haskins was offered as a witness to prove, that he as broker for the maker, sold the note to Hermison at a discount not exceeding legal interest, and Hermison, who was released and not interested, was also offered to prove that he gave full value, and that there was no usury. They were both rejected—and the Judge directed the Jury, that they were to consider Haskins as the lender, and as illegal interest was taken by him, the note was void in its inception, and bad though in the hands of an innocent purchaser. The jury found, however, for the plaintiff and on a motion made for a new trial, two Judges were of opinion, that on the evidence admitted the instruction was correct; but that there was error in rejecting the witnesses, and that the case ought to bo *70 tried on the whole evidence, considering Haskins as merely the agent of the maker and a competent witness.
The other two Judges concurred that the witnesses were improperly rejected; but saw no ground for a new-trial, for if Haskins was the agent of the maker, he was bound by his acts, and considering him in that relation only there is no proof of usury; the secret transactions between a principal and his agent, cannot influence the contract he makes for his principal with others. If all the Judges had concurred therefore, this case would only prove, that if the maker offers his note for discount, and it is discounted at usurious interest by the person to whom it is offered, it is usuiy—which is a principle I have admitted.
The case of Wilkie v. Roosevelt, (b) is precisely of this character. Marx & Co. the makers of the notes, were indebted to Goodrich the broker, and the note was taken from them by the latter, at a discount of 34 per cent, per month, and passed for full value to the plaintiff. It was there pi'operly held, that Goodrich was the lender, and so the note being bad in its inception, could not be made good by being passed for full value to an innocent holdex*—a doctrine never disputed. However, even in this case, Lewis, Chief Justice and Livingston dissented, though no opinion is reported as having been given by them.
The next case is that of Man v. the Commission Company. That case I understand to have been decided, on the point of usury in favour of the plaintiff. The Judges go on to lay down certain dicta, which seem broad in their charactei’, it is true; but as they had no case befoi'e them to which those dicta could apply, and as the only authorities they refer to for them, were those of’ their own court above noticed, it is not to be presumed that they intended them to go beyond those cases, and if *71 they did, I think those dicta are not only unsupported by, but contrary to all the leading doctrines here and elsewhere.
Indeed in this very case, they say, the principle is too well settled to be questioned, that a bill, free from usury in its concoction, may be sold at a discount below the legal rate of interest, and the reason is this: as the bill was free from usury between the immediate parties to it, no after transaction with another person, can as respects those parties invalidate it.
The case of Bennet v. Smith in the same book p. 357, was of this nature. There F. applied to IT. to lend Mm money, he declined lending, but told him if he had any good notes he would buy. A few days after. F. brought notes executed by the defendants, which H. purchased at a discount of 21 per cent, but knew not as lie said but that these notes were given to F. in the ordinary course of trade. A witness proved that F. applied to the defendants for a loan of their notes for gS6S: saying he had agreed with H. to sell notes to him at 21 per cent, discount.
This was held to be usury, and though broad doctrines are here also stated to have been settled in that court, yet this case might well be held to be one of usury. A loan was asked, it wras shifted to a pretended purchase of paper, which the party had not then executed, the premium was agreed on and the paper soon after procured.
All the cases then in this court, were cases of usury in the inception, except one, and in that some broad dicta are thrown out, which, to the extent they are no\tf said, to go, are unsupported by any adjudged case.
The fallacy of the argument which goes to the full extent this case requires, it appears to me, must rest in. thisj not that a party fairly and innocently purchasing a note indorsed for the accommodation of the maker, is himself guilty of usury, and subject to the penalties of the statute, but that he is like the innocent purchaser of *72 a note—usurious in its inception between other parties. For how* a man can be guilty of a crime, when his act may ,°r may not be innocent according as facts shall turn Out thereafter, and of which he is ignorant, I cannot ■ ° , imagine. For instance; suppose these notes, indorsed py Allison, were for accommodation, but those indorsed by Atkinson for full value, and both purchased at the same moment, and under the same circumstances; can it be possible that the transaction as to one shall turn out afterwards to be proper and legal, and that as to the other the penalties of the act shall be incurred?
But to avoid a note for usury the penalties of the act must be incurred by somebody: there is no avoiding it without guilt somewhere. In the case put, though Allison, the indorser, would not have subjected himself to those penalties, nor would Mertens, the broker,—Bruce must have done so, otherwise the note cannot be void. Could a jury, on a plea of not guilty, and the answer must at least be equal to such plea, find him guilty, and subject him to those penalties, on the evidence exhibited in this cause?
I think they surely could not: but suppose they could find, on those facts, that he knew he was in reality purchasing an accommodation note from the maker himself, still that will not satisfy the doctrine contended for. According to that doctrine, they must find him guilty, although he knew no such thing, but on the contrary believed he was doing what has been repeatedly sanctioned by this court. In other words they must find him guilty although they believe him to be innocent.
I shall not take a minute view of the cases in Campbell and the other cases cited, being satisfied, that they all turn on the ground that some person, in the original concoction of the nóte, has been guilty of a crime, and offence against the law, and although various circumstances, tending to prove that, will strike different minds in different ways, yet guilt must appear in the concoc *73 lion of the business, and must be brought home, by full proof, to some one originally concerned in if.
As to the recovery being limited to the sum given for the notes, I consider it not necessary to decide what .... . would he the case as between the holder and his immediate indorsee, this suit being by the maker against the holder. As to him the notes are either bad for usury, or good in Mo as it at present appeal's to me. Besides, if this be a good defence it will be open at law, and not concluded by the dismission of tins bill.
The decree must’therefore be affirmed and this case put to rest, though from the division of the court, the law in this important point is not settled.*
Brooke, Judge.
When this case was before decided I gave a silent assent to the decree of the Chancellor, because I did not perceive that there was any difference of opinion in the court on the principles, which were to govern it; from the very able opinion of the dissenting Judge, 1 have not been able to deduce a different conclusion. After the utmost attention to the argument, which has since been submitted to the court, and the most deliberate reflection on the cases adduced, I have not seen cause, in any material degree, to change my first impressions. The facts charged in the bill are as follows: it is alleged that Holloway and Ilanserd, being much pressed for money applied to the defendant Bruce for a loan of §§3603 78 which they obtained at the usurious interest of 2# per cent, per month, and executed their notes for §§1400 each, negotia *74 ble at the Bank of Virginia, with John Allison as indorser'—the first note payable in six months, the second in nine months, and the third in twelve months after date; an(‘ seconll notes were paid at maturity; and the third lodged in the bank; that afterward, the sait| Holloway and Hanserd, being in increased distress applied for a second loan which they obtained at more exorbitant interest, from 20 to 25 per cent, and executed two other notes, with Thomas Atkinson as indorser, payable at nine and ten months, negotiable at bank, which are also deposited in bank for payment: that Hanserd, the surviving partner of the firm; will not avail himself of the act against usury lest it should injure his credit, and that if the notes are paid out of the company subject, it will be ruinous to the estate of Holloway and prejudicial to his creditors. To these allegations the defendant Bruce answered; he denies any knowledge of any communication for a loan, admits that he purchased the notes of Mertens the broker, at the discount stated, insists that it was a fair purchase without any particular knowledge of the circumstances of Holloway and Hanserd, or that the broker was their agent; that notes of persons of unquestionable solidity might have been purchased at a greater discount. To this answer an exception was taken, on the ground, that it was not sufficiently explicit as to ■the defendant Bruce’s knowledge of the agency of Mertens the broker. In his second answer, he avers, that he ■did not recollect or believe that Mertens informed him, that he was the broker or agent of Holloway and Hanserd, or of either of them, or that he had received information to that effect from any other person. Whether ■this last answer was sufficient or not, it is not material to discuss, as no exception is taken to it; there is certainly an appearance of caution in it which deducts from it somewhat, the credit, that otherwise would have been due to it; had the plaintiff insisted on a discovery in his bill, he ought to have excepted, and he might have extort- *75 till from the defendant a more direct and full answer; in the shape which he has given to it he might, if not satisfied, have again excepted; and the defendant would have then had the opportunity of shewing if he could, that in effect his answer was as full as a more elaborate statement of the circumstances could have made it: but the plaintiff took issue on it and relies on the evidence of Mortens, the broker, and of Ilaxhall and others, which last is not material, to support the charges in his bill: if they arc proved there can he no doubt of the usury. ' The objection by the counsel for the defendant, that the allegata in the bill do not agree with the probata, will he found upon examination, not to be of importance: the difference between a direct communication between Holloway and flanserd and the defendant Bruce, and an indirect one through Mertens, if proved to be their agent, will not be. material; Mertens3 testimony is most essential, and if it is not as full as it might have been, the plaintiff had the power to make it so by a more minute and precise examination of him. He proves, I think, that he was a general broker in Petersburg, in which place, the parties, except the defendant, Bruce, resided; that he was in the practice, as broker, of selling for those pressed for money, bills, notes, &c. and that he had frequently sold notes for II. & H., and that knowing the defendant Bruce purchased paper, he applied to him to purchase the first notes, described in the bill of the complainant, for the purpose of seeing whether he would give more for them than liad been offered by others; that ho purchased them at the price stated; that afterward he applied to him to purchase the second set of notes mentioned, and that he also purchased them at the discount stated in the bill, a discount not greater than was given for as good paper as any in the town: paying by a draft on Marx & Co. of Richmond; that he considered these transactions as sales commonly made of bonds and notes, at a discount, and sot as transactions between a broker *76 and a person leaving money in his hands to share with; that he made it a rule to make no communications to a person purchasing; that it was generally supposed, that ^rawei's were distress for money, but did not know that Bruce had any particular knowledge of it; that the indorsers of the notes were considered to be in good credit, &c. Haxhall says it was generally understood in Petersburg, that the drawers were distressed for money, that the defendant Bruce was well acquainted with them. The other testimony adds some particular instances in which he had purchased or discounted paper at a premium. The first question upon the testimony, I think, is, was the defendant Bruce informed that he was dealing with H. & H. for the notes in question, or had he such knowledge of the real transaction, as to subject him to the charge of a corrupt intention to violate the act against usury? My own impression is, that though he may have known the fact, that the notes were the property of the drawers, yet it is not so proved as to convict him of the charge. Upon the evidence, the notes might have belonged to others who had received them for value, and preferred selling them, to waiting until they came to maturity. Direct proof, I admit, is not required in these cases, but the inference ought to be as strong, as would be required to convict a party of the breach of a penal law in other cases. His knowledge that the drawers were pressed for money, if directly proved, does not produce the necessary inference that the notes were known to be their property; his knowledge of the high'credit of the indorsers, if it had been fixed on him by the testimony, would repel the idea that the notes were sold for their benefit; but, yet, the testimony of Mertens shews, that he often sold notes and bills for the benefit of persons,whose names were not on them; it would be, I think, hazardous to pronounce, that the defendant Bruce knew that the notes in question were not notes of that description, that ought at least to be satisfactorily shewn. If it *77 were proved that he knew the indorsers were not pressed for money, the inference would be a more direct one, that he knew they belonged to the drawers, and that in dealing with Mortens the broker, he was dealing with their agent: if 1 could come to tills conclusion, 1 should have no doubt of the usury, but not being able to fix upon the defendant Bruce the intention to commit usury, I shall proceed to consider the cases that have been relied on, some of which have been supposed to subject him to the consequence:) of committing usury. In the absence of testimony that he intends to do so, the case from 1 Raymond cited by Mr. Call shews, that a bill may be sold without indorsement, and that tine doctrine sanctioned in this court is not new in the case of Gibson and Fristoe. Mr. Pendleton said that in a mere sale of property, and bonds are, in this respect, as much property as any thing else, altho’ at an under value, it is not usury here, because price is a thing unfixt, and depends upon the convenience of the contracting parties! that hills and notes are as much so T presume will not be disputed. Judge Roams in the case of Price v. Campbell,, said, that in cases of this kind we are at liberty to infer usury from the circumstances of the transaction! hut in making this inference, we are confined to the inquiry whether there is a corrupt contract or agreement for usurious interest. So inference can he drawn from these cases, that an opinion was entertained by the Judges, that usury might be committed without proof of a corrupt agreement or contract in violation of the statute. These cases upon authority legalise a bona fule sals of bonds and bills—and notes stand on the same footing, nor are any of the cases cited to the contrary—whether contracts for the purchase of bills, bonds, or notes are a colour or pretence for an usurious loan, or a fair and honest transaction, is always to be decided by their circumstances. See Cowper’s Rep. 12. and 770. Doug. *78 708 and 3 Term Rep.(c) If a fair purchase, no matter what the discount, it is not usury. All the cases seem to proceed on this idea, and upon examination, I think it will be found, that there is no case in which a party, not ..... ... . ,. participating m the corrupt concoction of the contract, jias ijeen deemed a usurer: that the statute against usury will protect a party to an usurious contract though ignorant of the usury is not denied; but that under such circumstances it will subject the party to the consequences of committing usury is no where decided. In the case of Ackland v. Pierce, 2 Camp. 559, Le Blanck Judge, said, it was not material that the drawer of the bill, Prince, was ignorant of the usury which was between Waine the acceptor, and one White who discounted it. In that case, if I understand it, had the bill been a perfect bill before usurious agreement between Waine and White to discount it, it would have been a valid bill; it was the corrupt agreement to discount it at a greater than legal interest, in the inception of the contract itself, that made it usurious; it was a shift to evade the statute. Thus Lord Kenyon held in the case of Parke v. Eleason and others,(d) that a bill legal in its inception, indorsed by A. to B. for an usurious consideration, and by B. to C. without notice of the usury, and afterwards paid by C. to the assignees of B. who was bankrupt, though void as between A. and B. was valid in the hands of the assignees, who were clothed with the rights of C. the inno.cent indorsee. Whether the notes in the present case were legal in the inception will bo noticed hereafter; a contract usurious in its inception cannot be rendered valid altho’ in the hands of an innocent indorsee without notice: (e) blit on the contrary if it be originally fair and not usurious, no intermediate usury can affect it in the hands of a bona fide holder. (f) These last cases are referred to not *79 as authorities, hut because they were cited by the counsel, and conform to the English decisions. The principlc seems to he settled, that whether on the one hand, even a bona file holder of a bill must lose his remedy if there be usury in the concoction or inception of the bill except as against the party to whom lie paid value, on the other if the contract be fair between the original parties to it and no usury in that contract, it will be valid in the hands of a bona fie purchaser, though at a greater than legal interest. The latter conclusion follows, from the settled law that a note may be sold. If the notes in the present case were tainted with the usury in their inception; if there was a corrupt agreement between II. and H. and the indorsers, Bruce must lose his debt as against the drawers; and if also, be had participated in that agreement, or had knowledge of it, lie would be condemned as a usurer. None of the cases cited go farther; in the case in 1 Camp. 141, much relied on, King, the broker agreed with the acceptor to get the bills discounted at 40 per cent, the arrangement was made before the bills were accepted, it was a device to evade the statute: if Bruce bad discounted the notes at legal interest, there could have been no pretence that they were usurious; v/as ho a party to any agreement that they should be discounted at a higher rate; was he apprised that they were made so to be discounted, or that they were the bills of the drawers, from which to have inferred that fact. In the case of Hamilton v. Le Grange,(g) it is said by Justice Etkjk, that in construing any particular circumstances in order to found a conclusion of fact, especially in cases in which usury is alleged, we ought to deal with those circumstances according to the common sense of mankind. Pursuing the rule, the circumstances detailed by the broker, cannot lead ns to any certain conclusion, that Bruce knew the notes to have been made for sale and *80 certainly not to the conclusion, that he was a party to the making of the notes for that object. As before remarked, Merten® expressly states, that he was in the practice of selling notes also of a different description: . notes as! understand not made for sale, but real business 1]0[es which were not indorsed by the owner. Bruce W'as in the trade of buying paper, and it appears, gave for the notes in question, what the best paper free from the taint of usury sold for. It in impossible to infer from these circumstances, that he meant to practice usury in this case. However careless about the violation of law, lie would not without an adequate motive hazard the loss of his money. In the case of Hansborough v. Baylor, though not fully reported, it must, I think, be admitted that the ignorance of the latter of the transaction between the former and Bootes, was the real ground on which it was decided, that the purchase of the bond by Hansborough was not usurious; the bond was made to he sold at usurious interest. Judge Tucker says, that whatever even Baylor’s intentions were, Hansborough was ignorant of them; and though the former might even have intended to borrow upon usury, the latter seems only to have intended to make a fair purchase. The case in 3 Johnson (Wilkie v. Roosevelt) is not in conflict with this case; the purchaser was apprised of the object for which the bill was made, and though Wilkie was a bona fide holder, he could not recover as against the makers. There was usury in the concoction of the note, in which those under whom he claimed participated.— Marx & Co. made a note to the defendant which he indorsed—the Company then sent it to Goodrich a broker, "who received it at 3i per cent, discount, and in discharge of a debt due by the drawers to him and indorsed it to the plaintiff. The case in 2 Johns. Jones v. Hake is of ‘the same character; the general remark by one of the Judges that a note made to be discounted at illegal interest, is usurious, in the hands of a bona fide holder, is *81 10 be taken in relation to the actual case before the court. It applies to cases in which, as in the preceding, the purchaser of the bill was a party to the agreement or knew of the purpose for which the bill was made. In 15 Johns. Mun v. the commission company, it was decided that a bill valid in its inception is valid in the hands of an innocent indorsee though discounted at a higher rate than the legal interest. In Bonnet v. Smith and Phelps, it was said that a bill was waste paper until discounted, if nothing was due from the drawer to the payee, but 1 understand it to be law, that a party who indorses a bill for another makes him his debtor to the amount, because of his responsibility to pay. In the present case it could not be insisted on by the drawers that they were not indebted to the indorsers. If the notgs had been discounted in bank, or Bruce had discounted them at legal interest, such a pretence could not have been set up. The want of actual consideration between the drawers and indorsers is not material, after the bill has gone info the hands of one who has paid value for it, even though a fraud be committed by the indorser in the bilk yet this court held in the case of Williamson v. Robertson that the drawer was liable upon the principle, that he who trusts most, must bo the loser in a controversy with a party who gave value for the bill without any knowledge of the fraud.
I have not noticed Mr. Call’s second point, because I am of opinion it does not arise here; whether Bruce can recover more than he paid for the notes is a question which may be decided at law, and it is not alleged in the bill that Hanserd the surviving partner will not avail himself of any other defence, except the plea of usury; upon the whole, I am still of opinion, that the Chancellor’s decree is correct and ought to be affirmed.
IIoank, Judge.
This is a bill brought by the appellant, as administrator of IE, B. Iloiloway deceased, *82 aSains^ the appellee and others. It charges, that the late house of Holloway and Hanserd, of which the appellant’s intestate was a member, being greatly presse<* ^or moneJ^ became a prey to usurers,* and that, among others, they applied, on the 14th April 1811, to |¡ie appellee, who was appi’ised of their situation, for the loan of §3603 78, which they obtained from him, at the usurious and unconscionable interest of 1 a per cent, per month, and to cover which loan, they executed three '.notes for 1400 dollars each, with John Allison Esqr. as indorser, payable at six, nine and twelve months, respectively, as by a memorandum in the hand writing of the said intestate, and referred to as part of the bill, appeared. The bill makes a precisely similar charge in relation to another sum obtained on the 10th October 1811, at the still more exorbitant interest, as is alleged, of from 20 to 25 per cent, per annum: the said house, as is further charged being then in increased difficulties, and that this was known to the appellee; and to cover which loan, notes were given, with Thomas Atkinson Esqr. as indorser, payable at nine and ten months respectively after date.
The bill prays “that the appellees may full answer make to the premises;” and again, it prays generally that the appellee may set forth “all that he knows respecting the premises.”
To the important allegations of the bill respecting the pecuniary distresses of the house in question, the appellee makes no other answer, than that he had no particular information as to their circumstances. By this form of expression he endeavoured to evade the interrogatories aforesaid; although it is proved in the cause, that he must have been conusant of the general notoriety which prevailed, in relation to those distresses. To so much of the bill as charges in substance, (by referring to the memorandum abovementioned,) that Mertens, who is therein named, was the agent of Holloway and Han *83 serd, in the transaction aforesaid, the appellee only responds, in Ms original answer, after admitting that the negotiation was effected with him; that the question, whether he was their agent or not, was one with which he had nothing to do. And when pressed by the exception of the appellant for a more explicit answer on this point, he still only states, in his amended answer, that he does not recollect or believe, that Mertens informed him, that he was their agent, nor that he received information from any other quarter: all of which may be strictly time, and yet tlie appellee may bave undoubtedly considered Mertens as their agent in that transaction: he must have so considered him from the combined circumstances hereafter more particularly stated, and, especially, from the facts that Mertens was the known agent or broker for others, and seldom or never traded in paper of bis own. To so much of the bill, as charges the transaction to have been a loan, covered by the notes in question, the appellee, after using the common slang (if I may use so common an expression,) respecting the legality and even morality of purchasing notes, at ever so enormous a rate of discount, only says, that it was a fair purchase of the notes, and not a loan; whereas the receipt from a man of his own notes, payable at a future day, in consideration of money advanced, is only a loan evidenced by a note and not a purchase; and whether it is a loan or a purchase, is, besides, an inference of law, which the party is not competent to swear to. Again: the appellee says in his answer, that no communication for a loan ever passed between H. & H. and him. This may be true, and yet such communication may have passed from their agent: and, also, this assertion may be bottomed upon the erroneous supposition first stated, that the obtaining from a man his own note, for money advanced to him, is a purchase of the note and not a loan of money. Besides, there may well be a loan, without any formal communication therefor. A *84 receip^ by one man of 1 Ol. and a promise to pay 20/. therefor, at the end of the year, without more being said, or passing between the parties, is to all intents and purposes, a loan. Words in this case are not necessary: m the language ot the books res ipsa loquitur. A formaj communication for a loan is only necessary to be shewn, when a transaction has the form of a sale or the like, and the device is to be detected by shewing the real cause which brought the parties together. (Ord on Usury, 74. 1 Call, 62, Gibson and Fristoe.)
By these and such like equivocations, prevarications, and mental reservations, the appellee has sought to shelter himself, from the consequences of a full and frank answer to the charges contained in the bill. While I do not say that these equivocations operate an admission of the truth of the facts to which they relate, they on the contrary oppose no certain and positive denial to those facts. They give a character also to the answer which is very unfavorable to it, even in relation to such parts as would, otherwise be free from objection. The spirit of the maxim “falsum in uno, falsum in omnibus,” forcibly applies to it, and disparages the whole answer. At the same time, I must claim the right to say, that if this answer were one of the purest model, I do not know that its matter would at all vary my conclusion upon the subject.
The case made by the bill, is, that of an usurious loan of money, covered by the notes in question: and the ground taken by the answer, is, only, that the transaction was a purchase of the notes. The answer however does not state, that the appellee purchased them from Mertens, (the broker,) from the respective indorsers of them, or from any other person, being the actual owner of the said notes. The answer could not have taken this ground, as is abundantly shewn by the testimony. The question we are called upon to decide is, therefore, whether a note which has never been consummated in favor *85 of another person, for a valuable consideration, nor is purchased from that other, but receives its existence for the first time, in consequence of a usurious transaction, of which it forms a part, and which is only given by the drawer at the time of that transaction, and as an evidence of the contract, is free from the objection of usury? The question more particularly is, whether a contract which is manifestly usurious in itself, ceases to he so, in consequence of the borrower's putting in the hands of the lender, for the more easy proof of the promise, a writing, evidencing the existence of that promise?
This is the true question before us, upon this record. I shall therefore steer entirely clear of the question, whether a man owning tiie bonaJicle note of another, has a, right to sell the same, at an usurious rate of discount. This question has been affirmatively settled, and I do not mean to go into it, at this time: but I am authorised to say, that oven a transaction having the form of the sale of such a note, may be set aside, as a deyice to elude the act of usury by showing-, that the purpose of borrowing and lending brought the parties together. This was decided in the aforesaid case of Gibson and Frisloe: and this doctrine applies a fortiori to the case of a transfer of a man’s own note.
That the notes in question in this case were of the latter character and not of the former, is undoubtedly inferable from the circumstances, and is positively proved by the testimony. Of this fact the appellee could not have been ignorant: but it is entirely unimportant whether he were so or not, if in fact, such was the nature of the transaction. 1 will first shew what are the circumstances which go to establish this fact, and then refer to the positive testimony.
In considering the circumstances which warranted a, presumption that these were the notes of II. & IL, and of none other, and therefore, were neither consummated before this transaction, nor free from the objection of *86 usury, it is objected in the present place, that usury is not to be presumed. I admit that there is no testimony: but, it is most clear, that usury may be presumed from ^le ^‘bamstances, where they are sufficiently strong; and it would be strange indeed if it were not so, when even the crime of treason or murder may be inferred from circumstances. We are told in Onl on usury,(h) that circumstances are to be relied on to prove a contract to be merely a shift to evade the provisions of the statute: Again, it is said,(i) that many circumstances weigh in questions of usury, and that the courts formed their decisions upon all the circumstances of each case, without saying what weight any single circumstance would have. This is not only the established doctrine on this subject, but the same author has given us an enumeration of the circumstances most usually relied on in such cases: as for example the slightness of the hazard, the inadequacy of the price, and the distresses of the party.(k) Their distresses are proved to have existed in this case, and are always important in giving a character to the transaction. They compel the borrower to enter into the usurious contract: he is no longer considered particeps criminis in the transaction;(l) he is scarcely a free agent, and is held to be in the emphatical language of the books, “a slave to the lender.”(m)
That circumstances are to be resorted to in cases of this description results from necessity, and from the fact that they are often the only evidence to be expected. In 4 Hening’s Statutes at large (n) it is said, “that usurious “ contracts are always made in secret, and with such “ caution, that they can seldom be detected in the ordin- “ ary course of evidence;” and hence a hill for their discovery has been provided. In the case before us we can-: not expect positive evidence. We cannot expect the ap *87 prüee to say that he was informed, that the notes were the property of the makers, and not of the broker or indorsers; for that was a fact about which he asked no question, lest it might be affirmatively discovered, and afterwards rise up in judgment against him. We cannot expect to show that the borrower obtruded this testimony upon him, because, for the same reason that would have broken up the treaty. We cannot expect the broker will volunteer this information to the usurer: he knew his interest too well, and he now tells us that it was his practice never to let the lender know who the borrower was. Nor arc we to expect this information from other witnesses: they are sedulously kept out of the way in such transactions. Unless, therefore, wo resort to circumstances, we may get no testimony whatever, and had as well, at once repeal the statute.
If circumstances are permitted to operate, those existing in this case abundantly shew, that H. & H. were the borrowers* and neither Mertens, (the broker,) nor either of the indorsers of the notes in question; and that this must have been known, without the possibility of doubt to the appellee. It is proved in the cause, that the appellee was well acquainted with the circumstances of the mercantile houses in Petersburg, and that lie must have known that H. & H. were much distressed for money. On the contrary, it is shewn, that both of the indorsers were in easy circumstances, and one of them, at least, very wealthy, and even himself, a money lender: and as for Mertens, he not only acted as a broker, but he tells us, expressly, that as he acted as a broker, the appellee could not well suppose, that the notes were sold on his own account. Is it possible from these facts, from others for which I refer, particularly, to the record, and from the relation, circumstances and situation of the parties, that the appellee could have doubted, for a moment, that it was H. & II., and not the other parties who were making this ruinous sacrifice? It is not; nor *88 *s ^ CVen Pre^ent*c^ by the appellee himself. The notes, in question, so far from being shown to have been the pro-party of the indorsers, are not shown to have been even *n ^ie*r possession: and as to Mertens, when they were in his possession, it was as agent for H. & H., and for ^¡ie s;ng]e purpose of being discounted for an illegal premium.
But we are not compelled to rely on circumstances, only, as to the ownership of the notes in question. Mertens, himself, proves (and he is both a competent witness, and his deposition is made evidence in the cause, by consent,) that all these notes were put into his hands by Holloway. No ownership by any other person is even pretended. II. & H. were, therefore, the owners of the notes, or rather of the blank paper, at the time and this was well known to the appellee. This knowledge, however, is quite unimportant, if the fact be so, as the cases to be presently cited unquestionably prove. Every argument which goes to shew, that an innocent indorsee of a note given on an usurious consideration, without his knowledge of the usury, will be bound thereby, holds a fortiori as to a party to the transaction. We cannot in general suppose him ignorant of the real character of the transaction. The proof of such knowledge would be, in most cases, impossible; and to require it would operate a repeal, pro tanto of the act of usury.
If then it is settled, in this case, that H. & H. were the real owners of these notes, or of this paper, at the time of the negotiation, and no other person; and, much more, if that fact was known, as it unquestionably was, to the appellee, the case is brought to a simple point. In that view it was not a consummated and bona fule note of another, which was sold by the owner, and which in its origin and consummation was free from, the taint of usury, but it was a blank piece, of paper, which as an effective note, was coeval with, and only ushered into existence by the usurious contract, and was only deliver *89 ed to the appellee as an evidence of that contract. In that view, also, it was, in relation to the indorsers, only an accommodation note. Although their names were on them, they paid no consideration therefor, had no interest therein, nor possession thereof, and could bring no suit «pon them. The first person who paid a consideration therefor, was the appellee, and he is the first person who, but for the usurious consideration, could have maintained an action upon them. The names of the indorsers being only added thereto, as a further security, they could neither bring any suit upon them, independently of the usury, nor assign them to any person having notice of their real character. All this was decided by this court in the case of Norvel v. Hudgins.(o) In that case it was decided, that the existence of the indorser’s name, upon the note, was no conclusive evidence of ownership; and that is the only ground on which the appellee’s counsel argued, contrary to the facts proved in the cause, that these notes may have been the property of the indorsers, or of some person other than the makkers. Notwithstanding the existence of these names, on the notes before us, the makers might, (upon the testimony,) have thrown them into the fire.
The difference, as to this particular, between an inchoate note standing under these circumstances, and a real bona fide note, of one man held and sold by another, is so clearly settled by adjudged cases, that I will now-only proceed to cite them.
I will first rely on some cases decided in the Supreme court of the State of New-York. They are equally entitled to credit, from the highly commercial character of that State, and the ability of tbe judges who decided them. I quote them, also, for the farther reason, that they entirely accord with my opinion. These decisions depend upon the statute of usury of the State of New- *90 which one of the counsel said he had examined* and found to be, substantially, the same with our act.
In the case of Mun v. the Commission company, &c.(p) was tlecided, that the true test in cases upon bills and notes, was whether the bill or note was perfected, before it was discounted at usurious interest: that as it is settled, that a bill or note which is free from usury, in its concoction, may be sold at an usurious discount, for that as it was free from usury between the original parties, no after transaction can, as to these parties, invalidate it; so, it is equally clear, that if a bill or note which is made for the purpose of raising money on it, is discounted at an usurious rate of interest, and where none of the parties whose names are on it, can, when it becomes mature, bring a suit upon it, provided it had not been discounted, in that case such discounting would be usurious, and the bill void: and that if a bill or note in which the indorser has no interest, but merely lent his name for accommodation, is discounted at an usurious rate of interest, the purchase thereof is void, because until the time of the purchase, it remained a mere blank piece of paper. This is, precisely, the predicament of the notes before us.
In the case of Bennet v. Smith,(q) the principle of the foregoing decision is entirely recognised and ratified; because a note made for the purpose of being discounted, at a usurious rate, and indorsed for the accommodation of the maker, was void in its original formation, and it was held that it was quite immaterial whether the purchaser knew of the manner in which the notes were made or not. I infer, therefore, that it is the criterion before mentioned, and not this knowledge, which decides the fate of the transaction.
In the case of Jones v. Hake(r) where A. made his note payable to B.; which was indorsed by him, and C. *91 .and D., and sent by A. to a broker to raise money upon, and E. bought it at an usurious rate of discount, in an action by G. this note was held to be usurious and void. It was held by the court, that this note was indorsed for : . • .. the accommodation of A. alone; that no money was paid therefor by any of the indorsers; that it was a contract between A. by bis agent, (the broker,) and E. who lent the money, and took the note as his security; that the lender E. was in reality the first holder of the note, for value, or who could sue upon it; and that this pretended sale was, therefore, a shift to evade the provisions of the statute.
This case seems entirely in point with the case before us. J am unable to discover even a scintilla of difference between them.
Again; in the case of Wilkie v. Roosevelt(s) where A. made his note to B., who indorsed it for the accommodation of A., and A. passed it by means of a broker to C., at an usurious rate of discount, it was held, that although the note was indorsed by B. for the accommodation of A., it passed immediately from A. to C., and that the transaction was in its inception usurious, and the note consequently void. It was further held that B. was merely a collateral security for the accommodation of A., that he* B. paid no consideration for it, but that it passed to the broker to be discounted at an usurious rate of interest, and when discounted, it passed immediately from A. to the purchaser. It was so held, I presume, on the further principle, that a note which is in possession of a man’s agent is still in his possession. ' This case is also full up to the very point before us.
If gentlemen are more fond of cases from Westminster-Hall, than of these northern lights, as one of the counsel was pleased to term them, I will now endeavour 1o gratify them.
*92 In the case of Young ¶. Wright in court of K. E. in England, (t) where A. drew a bill of exchange on B., payable in three months, to his (A.’s) order, and A. indorscd it to C., who indorsed it to the plaintiff; and A. having put it into B.’s hands for whoso accommodation it was drawn, and D. swore that he was in the habit of 'discounting bills for B. at an usurious rate of discount, and had agreed to get it discounted at 40 per cent, for B., and that, on these terms, it was passed to E., it was held by Lord EUenborovgh, that at the time the bill was drawn there was a corrupt agreement that it should be discounted at usurious interest, by which it was vitiated, into whose hands, soever, it should come.
In principle there is no difference between this case, and those first cited, or the case at bar. There is no difference between the issue of a note which is preceded by an usurious agreement, and one whose emanation is coeval with such agreement, and forms a part of the usurious transaction.
In the case reported 1 Marshall's Rep. 210, in the C. B. in England, it was held that as the object of the makers of the note was to accommodate the payee, he (the payee) could not have sued them. This accords with all the cases before cited, and with the aforesaid case of Norvel v. Hudgins. It shows that a note indorsed for accommodation is not such a completo and perfected note, as would avoid the objection of the statute, under the distinction I have taken.
In full accordance with the foregoing’ decisions in both their branches are the opinions of the elementary writers upon the subject. Thus in Ord(u) it is held, that where a note is originally good, no usurious transaction between the intermediate parties can affect the title thereto in the hands of a bona fide holder; and again, (p. 100) it is held that a security which is originally valid, cannot be avoided by a subsequent usurious contract. So on the *93 other hand it is held (ib. p. 92) that a contract which is usurious in its inception cannot be afterwards rendered valid, in the hands of a bona fide indorsee, w ithout notice. Everything therefore, depends upon the perfecl ien and consummation of the note, anterior to the usurious transaction.
Í have said that alt hough the appellee, in the case before us, had full knowledge of the usurious nature of the transaction, that knowledge was entirely unimportant. The case of Ackland v. Pearce(v) entirely proves that position, in that case a bill of exchange was held void in the hands of a bona fide assignee, it being drawn in consequence of a usurious agreement, although the drawer to whose use it was made payable, was ignorant of such agreement, and the court held that if the bill must be valid because the parties to it cannot he shewn to have had notice of the usurious agreement, it would afford an easy recipe, to evade the provisions of the statute. The same doctrine is entirely held in the case of Lowe r. Waller.(w)
Nothing now said by me conflicts, in the smallest degree, with the decision of this court in the case of Hansborough v. Baylor. I have the original record in that case, now before me. By that record it appears, to have been a fair and naked case, of a sale of bonds. For any thing appearing in evidence, in that case, Bootes may have been, as Hansborough swears, he believed him to be, the bona fide owner of Baylor’s bonds. Bootes was a farmer, and not a broker, as Mcrtens was. lie too assigned the bonds, which is generally done by the owner, and never by a broker; whereas Mertens did not assign the notes, in the case before us. Hansborough also swears (and his answer is corroborated by the testimony,) that he did not treat with Bootes, as the agent of Baylor. , lie denies that he treated with him for a loan, and asserted that his only object was to purchase the bonds; *94 and he expressly denied, that the transaction was a device, to elude the provisions of the act of usury. In these important particulars, that case stands strongly contrasted with the case before us. In that case Hans-borough swore to facts which could not have been sworn to, by the present appellee. It is not shewn in that case, that Rootes was not the owner of the bonds; that they passed to him without consideration; or that the transaction was in its origin invalid. In these points also the two cases entirely differ. It is true that Hansborough admits, that he was informed that Rootes was not the owner of the bonds, after the time of his purchase: but this information may have been erroneous: and it is not established to be correct, by the testimony. That case, therefore, being one of a simple sale of bonds, as far as appears in evidence, decides nothing as to the case before us.
The single circumstance of there being an excess of the legal interest received in this case, determines the contract to be usurious, (x) Again, it is said, that intentionally taking more than six per cent. for. the use of money, alone, makes the contract usurious, (ib. 88) This doctrine is more emphatically shewn by the decision, that where more than six per centum is reserved, by the mistake of the scrivener, and contrary to the intention of the party, the contract is not held to be usurious.(ib. 59.) In such case the exception proves the rule. It shews •that although there must be a corrupt intent in the contractor to constitute usury, (ib.) that intent is inferred, from the single fact, that more than legal interest is reserved. Such a reservation, to say the least, throws the labouring oar on the adverse party; it throws the onus probandi upon the appellee, in the case before us.
Although, therefore, the form of the transaction, in the case before us, is that of a sale of notes, and although •in the case of the perfected notes of one man bona .fide *95 held by another, they may be sold by him, at any rate of discount, when considered as a fair and insulated transaction, the latter is not the case in the present instance, and the form of this transaction will not elude the provisions of this statute. We are told by Lord Mansfield in the aforesaid case of Lowe v. Waller, that the real question in cases of this kind, is, what is the substance of the transaction, and not what is its form and colour. He also tells us that where the substance of it is a borrowing and lending, at an usurious interest, the wit of man is not capable of taking the case out of the operation of the statute.. We cannot " wink so hard” to borrow another expression from this great judge, as not to see that the substance of this case (now before us) was to borrow7 money at an usurious interest, or to use the language of the broker (Mertcns) « to raise money by shaving paper.”
In the time of Lord Mansfield the moat usual form of usury, in England, was by a pretended sale of goods, (y) the most usual form here is, perhaps, by a pretended sale of notes. Formerly we are told by the same judgc(z) when one mode of usury which was most common was prohibited by a statute, it put, the usurers upon other contrivances to evade the statute, and lie adds that experience lias taught the legislature, in England, in their modern acts upon this subject, not to specify and prohibit particular modes of usury, because that only led to evasion, but the better way was, to enact generally, that no shift or device should enable men to get more than six per cent, on a loan. The same idea is kept up in Ord(a) and he adds, the English legislature were on this ground induced to use the more general terms "directly” or "indirectly” to prohibit the practice of usury. The, words of our act are equally general and comprehensive. It requires only the attention of the courts, to decide what *96 is the substance of the transaction, to look beyond the mere form and to further the policy of the legislature. The courts ought to test each case by its particular circumstances, under that general criterion wj,)jc]1 ^jie iegis]atin»e iias deemed it best to establish, instead of detailing and prohibiting particular modes of usury.
Acting upon this principle, I cannot, for a moment, doubt, but tháí this case is, emphatically, within the statute. The substance of the transaction is, most clearly, that the appellee was to lend to II. & H. the money in question, for a considerable time, which they promised, (by means of the notes before us) to repay him with an usurious and an exorbitant interest. The furnishing the appellee with explicit evidence of his right, under the contract, cannot cleanse that contract of its impurity» We have undoubtedly gone far enough in sanctioning the sales of the consummated notes of others, bona fide held by the seller, at an usurious rate of discount. This, it must be confessed, is a sufficiently fruitful source of usury. I again beg it may be distinctly understood, that I do not now mean to touch that question. That question is not new, and, perhaps, may not he considered open. I will not, however, go further and permit a man to sell, not his own note, for a noto pre-supposes a real payee, as well as a drawer, but his own blank paper at an illegal rate of discount. I will not, by this means, disrobe the consideration on which it is granted, of its usurious taint, and repeal pro tanto the act of usury. If an infamous transaction is not merged and purified by giving a bond upon it, which, generally, in itself, supports a good consideration, far less is it, when only a note is given as an evidence of that contract. In all cases of bills or notes, their consideration must be shewn to be good, save only, in the case of bills of exchange, when they have passed into hands other than those of *97 the original parties thereto.(b) As to the appellee, he must shew that the consideration on which the notes in ques-were founded, was not liable to objection: the converse of this is however, shewn, on the part of the appellant. Under the form of selling a man’s own notes, Í will not legalise a contract, whereby in substance, for 101. now received, he is to pay 201. at the end of six months; and that too, out of his own coffers. The proposition is monstrous, and cannot for a moment fee entertained, by those who disclaim the power to repeal an act of the legislature. There could he no objection to my granting my note for 20Í. for the H i received as aforesaid, did not the grant carry with if, the right to receive the money; to receive more than the sum lent, with an interest at tiie rate of six per centum per annum. There would be no objection to the transfer, if it carried with it the paper and the paper only.
When l formerly gave an opinion in this case, I signified my willingness, in the spirit of accomodation to the other judges, to consent to an issue to try the question. That overture was not accepted by them, and I now, explicitly, withdraw it. I cannot now consent to such an issue; because it is proved to my conception, as clearly as human testimony can do it, that the transaction in question, both in its origin and consummation was founded in usury. It is equally clearly proved, that this was known to the appellee, the chief actor and mover in the business: but it is wholly unimportant as aforesaid «whether he had that knowledge or not. My opinion therefore, is, to reverse the decree, and render one pursuant to the prayer oí the bill. The appellee, in my. judgment, should be made to disgorge his illegal and iniquitous gains, and receive only his principal money, which is secured to him by the express provisions of the statute. That, however, is not the opinion of the other judges. *98 Their opinion is, that the decree dismissing the bill should be affirmed; and it is to be affirmed accordingly.

 Cabell absent.

 2 Munf. 36.

5) 3d Johnson, 66.

 It was in this case understood by the bar, that the concurrence of less than a majority of the whole court, though it would determine the rights of the parties in the particular cause, could not fix a •precedent for future decisions. Consequently, the court now consisting of five members, but only three sitting in this cause, the opinion of tlie two concurring Judges wouid not close the questions discussed in the case, should they arise in another controversy.

CJVote by the Reporter. J

 Tate v. Wellings;, 531.

e) 1 East. 94.

- (a) Wilkie v. Roosevelt, 3 Johnston 206, and Bay’s Rep. Payne r. Tervant, 23.

 Tatty v. May, 1 Bay’s Rep, 486.

 2 H, Black. 144.

 Page 69.

 Ord 69, 74, 84.

 Doug. Bep. 698, Smith v. Bromley.

 Id. 87.

 Ord 116.

 Page 390.

 4 Mun. 496.

 15 Johnson’s Rep. p. 54

 Ibid. p. 355.

 2 Johnson’s Rep. p. 60.

 3 Johnson, 66.

 1 Camp. 140.

 P. 96.

 1 Camp, 390.

 Doug. 708.

 Ord 47.

 Doug. 710. Lowe v. Waller.

 Ibid,

 P. 68.

 Chitty 16.